UNITED STATES of America,
Plaintiff(s),

v.

Dean LUGO DÍAZ [54], also known
as Bolon, Defendant(s).

Criminal No. 12–414[54](DRD).

United States District Court,
D. Puerto Rico.

Signed Jan. 22, 2015.

Alberto R. Lopez–Rocafort, U.S. Attorney's Office, San Juan, PR, for Plaintiff(s).

## OPINION AND ORDER

DANIEL R. DOMÍNGUEZ, District Judge.

Pending before the Court are: (a) *Rule 29(c)(2) Motion to Set Aside Verdict and Enter Judgment of Acquittal* filed by defendant Dean Lugo Díaz [54] ("Lugo Díaz"), Docket No. 2147; and (b) *United States of America's Response in Opposition to Defendant's Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure,* Docket No. 2184. For the reasons set forth below, the defendant motion for acquittal is denied.

### Factual and Procedural Background

On or about May 24, 2012, the Grand Jury returned an *Indictment* against defendant Lugo Díaz, and 73 other individuals charged with several counts for "knowingly and intentionally, combine, conspire, and agree with each other and with diverse other persons known and unknown to the Grand Jury, to commit an offense against the United States, that is, to knowingly and intentionally possess with intent to distribute and/or to distribute controlled substances, to wit: in excess of two hundred and eighty (280) grams of cocaine base (crack), a Schedule II Narcotic Drug Controlled Substance; in excess of one (1) kilogram of heroin, a Schedule I, Narcotic Drug Controlled Substance; in excess of five (5) kilograms of cocaine, a Schedule II, Narcotic Drug Controlled Substance; in excess of one hundred (100) kilograms of marijuana, a Schedule I, Controlled Substance; within one thousand (1,000) feet of the real property comprising housing facilities owned by a public housing authority, to wit: El Coral, Lagos de Blasina and El Faro Public Housing Projects." *See* Dock-

et No. 3, pages 7–8, and 21 U.S.C. §§ 841(a)(1), 846 and 860.

Although the *Indictment* is silent as to the date of the commencement of the conspiracy, it is certain that it was "no later than in or about the year 2004, and continuing to and until the return of the instant *Indictment,* in the Municipality of Carolina, District of Puerto Rico." *Id.,* pages 5–6. "The object of the conspiracy was to distribute controlled substances at El Coral, Lagos de Blasina and El Faro Public Housing Projects, Villa Justicia Ward and in other areas within the Municipality of Carolina, Puerto Rico, all for significant financial gain and profit." *See* Docket No. 3, page 8.

It was part of the conspiracy that the leaders "would purchase wholesale quantities of heroin, cocaine and marijuana in order to distribute the same in street quantity amounts at their drug distribution points located in El Coral, Lagos de Blasina and El Faro Public Housing Projects, Villa Justicia Ward and other areas within the Municipality of Carolina, Puerto Rico." *See* Docket No. 3, page 8. The conspiracy was managed by the leaders who "would maintain a group of co-defendants administrating the daily activities of the drug distribution point." *Id.* "The defendants and their coconspirators would act in different roles in order to further the goals of the conspiracy, to wit: leaders and drug point owners who directed and supervised runners, enforcers, sellers, drug processors, lookouts, and facilitators." *Id.* "At various times during the course of the conspiracy, leaders purchased firearms and allowed members of the conspiracy to carry such firearms and ammunition in order to protect the drug distribution activities." *See*

Docket No. 3, page 12. Defendant Lugo Díaz was identified in the *Indictment* as a seller for the drug trafficking organization. *Id.,* pages 18 and 20.

As stated above, defendant Lugo Díaz was indicted on May 24, 2012, on Counts One through Five, which involve several violations, to wit:

(a) **Count One,** being a member of a **conspiracy** with the intention to knowingly possess and distribute and/or distribute controlled substances in excess of two hundred eighty (280) grams of **cocaine base (crack),** a Schedule II, Narcotic Drug Controlled Substance; in excess of one (1) kilogram of **heroin,** a Schedule I, Narcotic Drug Controlled Substance; in excess of five (5) kilograms of **cocaine,** a Schedule II, Narcotic Drug Controlled Substance; in excess of one hundred (100) kilograms of **marijuana,** a Schedule I, Controlled Substance; within one thousand (1,000) feet of real property comprising public housing facilities;"[1] 21 U.S.C. §§ 841(a)(1); 846; 860, *see Indictment,* Docket No. 3, pages 5–22;

(b) **Count Two,** possession with intent to distribute "one (1) kilogram or more of a mixture or substance containing a detectable amount of **heroin,** a Schedule I Narcotics Drug Controlled Substance, within one thousand (1,000) feet" of a public housing facility owned by a public housing authority, *see Indictment,* Docket No. 3, pages 22–24;"

(c) **Count Three,** aiding and abetting in the possession and distribution of "two hundred and eighty (280) grams or more of a mixture or substance containing a detectable amount of **cocaine base**

---

1. Generally, the three public housing projects specifically referred to in the *Indictment* are El Coral; Lagos de Blasina, and El Faro Public Housing Projects, as well as Villa Justicia Ward, "and other locations outside the public housing projects in order to store and conceal heroin, cocaine base ("crack"), cocaine, marijuana, drug paraphernalia, firearms and ammunition." *See Indictment,* Docket No. 3, page 9.

(Crack), a Schedule II Narcotic Drug Controlled Substance, within 1,000 feet of the real property comprising a public housing facility owned by a public housing authority;" 21 U.S.C. §§ 841(a)(1), and 860; 18 U.S.C. § 2, *see Indictment,* Docket No. 3, pages 24–26;

(d) Count Four, aiding and abetting with the intention to possess and distribute "five (5) kilograms or more of a mixture or substance containing a detectable amount of **cocaine,** a Schedule II Narcotic Drug Controlled Substance, within 1,000 feet of the real property comprising a public housing facility owned by a public housing authority;" 21 U.S.C. §§ 841(a)(1), and 860; 18 U.S.C. § 2, *see Indictment,* Docket No. 3, pages 26–28;

(e) Count Five, aiding and abetting in the possession and with the intent to distribute one hundred (100) kilogram or more of a mixture or substance containing a detectable amount of **marijuana,** a Schedule I Controlled Substance, within one thousand (1,000) feet of the real property comprising a public housing facility owned by a public housing authority;" 21 U.S.C. §§ 841(a)(1), and 860; 18 U.S.C. § 2. (Emphasis ours). *See Indictment,* Docket No. 3, pages 28–30.

A jury trial was held from July 7 to 17, 2014, that is, eight days. On July 17, 2014, defendant Lugo Díaz was found guilty by a jury on Counts One, Three, Four and Five. *See Jury Verdict Form,* Docket No. 2119. On July 21, 2014, defendant Lugo Díaz moved the Court for an extension of time to file a motion under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"), and the same was granted. *See* Docket entries No. 2122, 2125. On August 8, 2014, defendant Lugo Díaz timely filed a *Rule 29(c)(2) Motion to Set Aside Verdict and Enter Judgment of Acquittal,* Docket No. 2147, challenging the verdict rendered by the jury and moving the Court for a judgment of acquittal on all counts, for lack of evidence.

In his motion, the defendant alleges that "[t]here is absolutely no evidence that the defendant had any knowledge or joined any conspiracy in any other different housing project." *See* Docket No. 2147, page 2. Defendant cited, in support of his argument, several parts of the testimony of defendant Zeus Cordero Alvarez [25], a cooperating witness, who testified on July 10, 2014 during trial. *Id.* Defendant further argues that the Government failed to show that he "had the intention to join the conspiracy alleged in the Indictment." *Id.,* page 6. "The evidence did show there were different kind of drugs sold in different housing projects making them different conspiracies." *Id.* "Mr. Lugo Díaz, never participated in the other different conspiracies charged in the Indictment." *Id.* "Another aspect of the case is the existence of multiple conspiracies and the attempt of the Government to include Mr. Lugo Díaz in the same." *Id.* "During trial evidence [sic] of multiple conspiracies were presented and the knowledge participation of Mr. Zeus Cordero Alvarez and Mr. Balu were totally different as the one of Mr. Dean Lugo Díaz." *Id.,* page 7. "The evidence connecting the defendant to a conspiracy was different to the one charged in the indictment." *Id.* "As to the conspiracy charge the evidence was insufficient viewing the evidence in the light most favorable to the verdict." *Id.,* pages 7–8. Defendant further alleges that, notwithstanding that "Mr. Oppenheimer is a common key figure connecting the conspiracies that fact in itself does not necessarily makes several different conspiracies in unifying them in just the one conspiracy charged in the indictment." *Id.,* citing *Kotteakos v. United States,* 328 U.S. 750, 772, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

On September 9, 2014, the Government filed its *Response in Opposition to Defendant's Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure,* Docket No. 2184, moving the Court to deny defendant's motion for acquittal, on the following grounds:

(a) "[T]he evidence adduced at trial was sufficient to prove that the defendant knowingly and intentionally joined a single overarching drug conspiracy." *See* Docket No. 2184, page 4. "The object of the conspiracy was to distribute controlled substances for profit at three public housing projects located in Carolina, Puerto Rico." *Id.* "The conspiracy involved numerous members, each having a distinctive role, and one leader, codefendant [1] David Oppenheimer." *Id.* "The trial testimony demonstrated that the defendant, trial co-defendant [12] Abraham Walker–Couvertier, and other co-defendants named in the indictment had the "common goal" of distributing Oppenheimer's narcotics at these public housing projects." *Id.*

(b) "[T]he testimony of Zuleyka and Zeus demonstrated that the 'common goal' of the conspiracy was to distribute controlled substances at these three public housing projects." *See* Docket No. 2184, page 6. "The testimony further proved that Oppenheimer was the leader of the conspiracy and that anyone who sold narcotics at these public housing projects worked for Oppenheimer." *Id.*

(c) The testimony of Zeus, "coupled with surveillance videos of the defendant selling narcotics, showed that the defendant was an active member of the conspiracy from at least 2006 to April 12, 2011." *See* Docket No. 2184, page 9, citing *United States v. Upton,* 559 F.3d 3, 10 (1st Cir.2009) ("A conspiracy endures as long as the coconspirators endeavor to attain the 'central criminal purposes' of the conspiracy").

(d) "Even assuming, arguendo, that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement, this fact alone does not imply multiple conspiracies." *See* Docket No. 2184, page 9, citing *United States v. Drougas,* 748 F.2d 8, 17 (1st Cir.1984). "In a unitary conspiracy, it is not necessary that the membership remain static." *Id.* (and the collection of cases cited therein). "The law does not require that the defendant know every other member of the conspiracy." *Id.,* citing *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

(e) The Government further alleges that, defendant Lugo Díaz "knew, and had contact with, other members of the conspiracy." *Id.,* pages 9–10. In support of its argument, the Government cites excerpts of the testimony of codefendant Zeus Cordero Alvarez to support the fact that defendant Oppenheimer was the leader to the conspiracy, notwithstanding the distinctive participation of each member of the conspiracy. *See* Docket No. 2184, pages 4–6. The Court notes that there are 74 defendants indicted. *See Indictment,* Docket No. 3.

(f) The Government alleges that the evidence presented at trial further showed that defendant Oppenheimer's leadership depended on the functions or performance of each member of the conspiracy. "The evidence at trial further illustrated interdependence among the co-conspirators." *See* Docket No. 2184, page

6. "Oppenheimer was the leader; he set the rules and supplied the narcotics that would be sold." *Id.* "**His success, however, depended on the continued cooperation of his co-conspirators, including the defendant** [Lugo Díaz], **who was a seller.**" (Emphasis ours). *Id.* Furthermore, the testimony of defendants Zuleyka Cordero Vega [13] and Zeus' Cordero Alvarez [25] further confirmed that "**Oppenheimer was the leader of the conspiracy and that anyone who sold narcotics at these public housing projects worked for Oppenheimer.**" (Emphasis ours). *Id.*

(g) The Government also emphasized through the testimony of defendant Zeus, that defendant Lugo Díaz had a "long and extensive participation in the conspiracy." *See* Docket No. 2184, pages 7–9, which includes the excerpts of the testimony of defendant Zeus. *See also* Docket No. 2184, pages 10–11, in which defendant Zeus also testified about the association of defendant Lugo Díaz with other drug sellers of the conspiracy.

(h) Furthermore, the Government emphasized on the fact that, aside from the testimonies of defendants Zuleyka [13] and Zeus [25], the defendant Lugo Díaz "was observed on video selling drugs with Balu on February 1, 2011, *see* Government's Exhibit # 21, and with Balu at the drug point on April 12, 2011, *see* Government's Exhibit # 22." *See* Docket No. 2184, pages 10–11. Hence, "the trial evidence was sufficient to prove that the defendant joined a single overarching drug conspiracy." *Id.*, page 11.

The Court agrees that the trial record shows that the evidence admitted was sufficient, as well as, relevant to show that the defendant was part of a single overarching drug conspiracy. Our analysis followed.

### Applicable Law and Discussion

A. **Motion for acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure.**

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed.R.Crim.P." or "Rule 29").

"Rule 29 of the Federal Rules of Criminal Procedure provides that a court may acquit a defendant after the close of the prosecution's case if the evidence is insufficient to sustain a conviction." *United States v. Alfonzo–Reyes*, 592 F.3d 280, 289 (1st Cir.2010). "[T]he tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Hernandez*, 146 F.3d 30, 32 (1st Cir.1998) (citing *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994)); *see United States v. Marin*, 523 F.3d 24, 27 (1st Cir.2008); *United States v. García–Carrasquillo*, 483 F.3d 124, 129–30 (1st Cir. 2007); *United States v. Boulerice*, 325 F.3d 75, 79 (1st Cir.2003); *United States v. Walters*, 904 F.2d 765, 770 (1st Cir.1990); *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir.1989).

When considering a Rule 29 motion, "[v]iewing the evidence in the light most flattering to the jury's guilty verdict, [the Court must] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reason-

able doubt." *United States v. Lipscomb,* 539 F.3d 32, 40 (1st Cir.2008). Thus, "the jurisprudence of Rule 29 requires that a deciding court defer credibility determinations to the jury." *Hernandez,* 146 F.3d at 32 (citing *O'Brien,* 14 F.3d at 706); *United States v. Walker,* 665 F.3d 212, 224 (1st Cir.2011) ("we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict."); *United States v. Munoz–Franco,* 487 F.3d 25, 41 (1st Cir.2007). Additionally, the Court "must be satisfied that 'the guilty verdict finds support in a plausible rendition of the record.'" *United States v. Pelletier,* 666 F.3d 1, 12 (1st Cir.2011) (quoting *United States v. Hatch,* 434 F.3d 1, 4 (1st Cir.2006)). This standard is a "formidable" one, especially as "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." *United States v. Loder,* 23 F.3d 586, 589–90 (1st Cir.1994) (internal quotation marks omitted). Moreover, there is no "special premium on direct evidence." *O'Brien,* 14 F.3d at 706. "**[T]he prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two.**" *Id.* (citing *United States v. Echeverri,* 982 F.2d 675, 677 (1st Cir.1993)) (Emphasis ours). Expressed in alternate fashion, "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992). As to evidentiary conflicts, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres,* 61 F.3d 967, 970 (1st Cir.1995); *see Hernandez,* 146 F.3d at 32 (the trial court is required to "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.") (citing *United States v. Carroll,* 105 F.3d 740, 742 (1st Cir. 1997)). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." *United States v. Ofray–Campos,* 534 F.3d 1, 31–32 (1st Cir.2008); *see also United States v. Cruzado–Laureano,* 404 F.3d 470, 480 (1st Cir.2005) (urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record.") (citing *United States v. Gomez,* 255 F.3d 31, 35 (1st Cir.2001)).

The United States Court of Appeals for the First Circuit ("First Circuit") reiterated the above general standard in *United States v. Melendez–Rivas,* 566 F.3d 41 (1st Cir.2009) (citing *Lipscomb,* 539 F.3d at 40), holding that the sufficiency standard for a Motion for Acquittal under Rule 29 required the district court to determine whether, viewing the evidence in the light most favorable to the government, a reasonable fact finder could have concluded that the defendant was guilty beyond a reasonable doubt. The Court, therefore, is not to discard compliance with the requirement of the standard of "guilty beyond a reasonable doubt." However, a defendant challenging his conviction for insufficiency of the evidence faces an "uphill battle." *United States v. Hernandez,* 218 F.3d 58, 64 (1st Cir.2000). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *United States v. de la Cruz–Paulino,* 61 F.3d 986, 999 n. 11 (1st Cir.1995).

As stated above, defendant Lugo Díaz alleges that "[t]here is absolutely no evidence that the defendant had any knowledge or joined any conspiracy in any other different housing project." *See* Docket No. 2147, page 2. "The evidence connecting the defendant to a conspiracy was different to the one charged in the indictment." *Id.*, page 7. "As to the conspiracy charge the evidence was insufficient viewing the evidence in the light most favorable to the verdict." *Id.* Lastly, defendant alleges that although "Mr. Oppenheimer is a common key figure connecting the conspiracies that fact in itself does not necessarily makes several different conspiracies in unifying them in just the one conspiracy charged in the indictment." *See* Docket No. 2147, page 5.

The Government, however, alleges that the evidence shows that the defendant Lugo Díaz was a seller that worked for Oppenheimer, and the fact that "every defendant did not participate in every transaction necessary to fulfill the aim of their agreement, this fact alone does not imply multiple conspiracies." *See* Docket No. 2184, page 9. "The law does not require that the defendant know every member of the conspiracy." *Id.*

In the instant case, the defendant's Rule 29 motion for the entry of judgment of acquittal fails to persuade the Court that an error was committed during trial that may warrant a judgment of acquittal of all counts. The Court briefly explains.

**B. Sufficiency of Evidence.**

In order to determine whether a judgment of acquittal is warranted, the court will "examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict." *United States v. Trinidad–Acosta*, 773 F.3d 298, 310 (1st Cir. (Puerto Rico) 2014). *See also United States v. Liriano*, 761 F.3d 131 (1st Cir.2014). In *Trinidad–Acosta*, the Court held:

> We do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence. Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime. *United States v. Troy*, 583 F.3d 20, 24 (1st Cir.2009).
>
> . . .
>
> "To sustain a drug conspiracy conviction, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying offense and that the defendant elected to join the agreement, intending that the underlying offense be committed." *United States v. Liriano*, 761 F.3d 131, 135 (1st Cir.2014). **"An agreement to join a conspiracy may be express or tacit, and may be proved by direct or circumstantial evidence."** *Id.* **"[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it."** *Id.* **We have held that "the continuing purchase and sale relationship between [the dealers and the defendant], and the dealers' knowledge of the [defendant's] re-distribution, would permit a jury to infer both an agreement between them that [the defendant] possess the drugs and the requisite intent as to the distribution."** (Emphasis ours). *United States v. Symonevich*, 688 F.3d 12, 24 (1st Cir.2012) (alterations in original) (citation omitted).

*United States v. Trinidad–Acosta,* 773 F.3d at 310–11.

"When evaluating the sufficiency of evidence, 'we draw the facts and all reasonable inferences therefrom in the light most agreeable to the jury verdict.' " *United States v. Guzmán–Montañez,* 756 F.3d 1, 8 (1st Cir.2014), citing *United States v. Williams,* 717 F.3d 35, 38 (1st Cir.2013); *see also United States v. Walker,* 665 F.3d 212, 224 (1st Cir.2011). "This is not an easy challenge for an appellant." *Id.*

Hence, when a defendant challenges his/her conviction on grounds of sufficiency of evidence, the Court must consider all facts in the light most favorable to the prosecution and make all reasonable inferences in the Government's favor. *United States v. García–Carrasquillo,* 483 F.3d 124, 129–30 (1st Cir. 2007); *United States v. Boulerice,* 325 F.3d 75, 79 (1st Cir.2003); *United States v. Walters,* 904 F.2d 765, 770 (1st Cir. 1990); *United States v. Serrano,* 870 F.2d 1, 5 (1st Cir.1989). During the inquiry under Rule 29, the Court shall "neither weigh the credibility of the witnesses nor attempt to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Munoz–Franco,* 487 F.3d 25, 41 (1st Cir.2007) (internal citations and quotations omitted).

As stated above, defendant Lugo Díaz [54] challenges the sufficiency of the evidence presented by the Government as to Counts One, Three, Four and Five, and moves for the acquittal of these Counts. Defendant based the insufficiency of evidence argument on the testimony of defendant Zeus Cordero Alvarez [25], a cooperating witness, who testified on July 10, 2014 at the trial. *See* Docket No. 2147, pages 3 to 6.[2]

The defendant argues that "[a]ll the evidence presented failed to show that Mr. Lugo Díaz had the intention to join the conspiracy alleged in the Indictment." *Id.,* page 6. Defendant Lugo Díaz further alleges that "[t]he evidence did show there were different kind of drugs sold in different projects making them different conspiracy." *Id.* Lastly, the defendant Lugo Díaz alleges that "[t]he evidence connecting the defendant to a conspiracy was different to the one charged in the indictment." *See* Docket No. 2147, page 8. "As to the conspiracy charge the evidence was insufficient viewing the evidence in the light most favorable to the verdict." *Id.*

The Government vehemently disagrees, and argues that the evidence was sufficient to show that the defendant Lugo Díaz [54] was indeed a member of the conspiracy led by defendant Oppenheimer supported on the testimony of other cooperating codefendants, as well as the videos recorded of the defendant Lugo Díaz selling drugs with the defendant Carlos A. Romero Ortiz [22] also known as Balu, on February 1, 2011. *See* Docket No. 2184, pages 10, 11 and Government's Exhibit No. 21, and Lugo Díaz with Balu at the drug point on April 12, 2011 on Government's Exhibit No. 22.

The Court disagrees with defendant Lugo Díaz' general and unsupported conclusory allegations, as it is settled that the defendant's participation in the conspiracy may be proven with circumstantial evidence.

"Besides, '[t]he testimony of a single witness can be enough to support government's case, and even the uncorroborated testimony of an informant may suf-

---

**2.** The excerpts of the testimony given by defendant Zeus Cordero Alvarez [25] on July 10, 2014 during trial, is sealed by *Order* of the Court.

fice to establish the facts underlying a defendant's conviction.'" *Trinidad–Acosta*, 773 F.3d at 312, citing *United States v. Meises*, 645 F.3d 5, 12 (1st Cir.2011) (internal citations and quotation marks omitted).

In the instant case, the Court heard three cooperating witnesses, defendants Zeus Cordero Alvarez [25], Zuleyka Cordero Vega [13], and Xiomara Rivera Velázquez [14], who testified that defendant Lugo Díaz was a seller of Oppenheimer in different drug points, particularly at three public housing projects located in Carolina, Puerto Rico, to wit, El Faro, El Coral and Lagos de Blasina. All witnesses were consistent on designating defendant Oppenheimer as the leader of the organization that controlled "the drug trafficking activities" at El Faro, El Coral and Lagos de Blasina. *See* Docket No. 2184, page 4. Furthermore, the record shows that defendant Lugo Díaz was recorded with surveillance videos carrying out several drugs transactions during the course of several years, that is, at least from the year 2006 until on or about April 12, 2011. *See* Docket No. 2184, pages 9–10. But *see also* Jury Instruction No. 10, as the Court cautioned the jury as to the testimony of the cooperating witnesses.[3]

The record further supports that defendant Oppenheimer was the leader of the of the conspiracy, and defendant Lugo Díaz was a drug seller or pusher who worked for Oppenheimer selling narcotic drug controlled substances. *See* Docket No. 2184,

pages 4–6. Moreover, the success of Oppenheimer's conspiracy directly depended on the drug sales made by the members of the conspiracy, such as, the sales made by defendant Lugo Díaz, amongst others. *Id.* The defendant Lugo Díaz, however, was unable to sustain his argument of insufficiency of evidence, based on the evidence admitted in the record. On the contrary, the Court finds that reasonable inferences were made by the jury based on the evidence presented.

## C. Circumstantial Evidence.

In *United States v. Liriano*, 761 F.3d at 135, the Court proceeds to the issue of a drug conspiracy based on circumstantial and/or direct evidence:

**To sustain à drug conspiracy conviction, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying offense and that the defendant elected to join the agreement, intending that the underlying offense be committed.** *United States v. Paret–Ruiz*, 567 F.3d 1, 5 (1st Cir.2009). **An agreement to join a conspiracy "may be express or tacit ... and may be proved by direct or circumstantial evidence."** *United States v. Rivera Calderón*, 578 F.3d 78, 88 (1st Cir.2009). **Finally, "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or partic-**

---

**3.** Jury Instruction No. 10: CAUTION AS TO COOPERATING WITNESS/ACCOMPLICE

You have heard the testimony of Xiomara Rivera–Velázquez, Zeus Cordero–Alvarez, and Zuleyka Cordero–Vega. They:

(1) Provided evidence under agreements with the government; and

(2) Participated in the crimes charged against defendants.

Some people in this position are entirely truthful when testifying. Still, you should consider the testimony of these witnesses

with particular caution. They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves. You must determine whether the testimony of such witness has been affected by any interest in the outcome of this case or any prejudice for or against the defendant. You may consider their guilty pleas in assessing their credibility, but you are not to consider their guilty pleas as evidence against the defendants in any way.

ipate in every act in furtherance of it." *United States v. Cortés–Cabán,* 691 F.3d 1, 14 (1st Cir.2012), (quoting *United States v. Martínez–Medina,* 279 F.3d 105, 113 (1st Cir.2002), *cert. denied sub nom Domínguez–Colón v. United States,* —— U.S. ——, 133 S.Ct. 2765, 186 L.Ed.2d 220 (2013)). (Emphasis ours).

In cases of circumstantial evidence, "the evidence is sufficient to convict if it adequately supports the requisite two-step inference: (1) that the [defendants were] engaged in obviously illegal activity [selling narcotic drug controlled substances], and (2) that each defendant was ready to assist in the criminal enterprise." *United States v. Pérez–Meléndez,* 599 F.3d 31, 42 (1st Cir.2010) (citing *United States v. Guerrero,* 114 F.3d 332, 342 (1st Cir. 1997)). In the instant case, the jury found, beyond a reasonable doubt, that there was enough evidence, direct and circumstantial, that warrant a guilty verdict, as to both defendants. *See also United States v. Bobadilla–Pagán,* 747 F.3d 26, 32 (1st Cir. 2014) (the sufficiency of the evidence is determined after having considered "both the direct and circumstantial evidence, in the light most friendly to the verdict").

Defendant Lugo Díaz failed to explain and support his argument of insufficiency of evidence based on the evidence admitted at trial, and also failed to prove why the reasonable inferences drawn by the jury should not be interpreted in the light most favorable to the verdict that is in the "most

agreeable [fashion] to the jury verdict." *See Guzmán–Montañez,* 756 F.3d at 8, and *García–Carrasquillo,* 483 F.3d at 129–130. *See also* Jury Instruction No. 7.[4]

## D. A Single Conspiracy v. Multiple Conspiracies.

Defendant Lugo Díaz [54] was found guilty by the jury "beyond a reasonable doubt" as to Counts One, Three, Four and Five. *See* Jury Verdict Form, Docket No. 2117. Notwithstanding, the defendant Lugo Díaz moves the Court for his acquittal on all the counts charged, on the grounds of insufficiency of evidence. *See* Docket No. 2147.

The Court, however, finds that based on the evidence presented, the guilty verdict rendered by the jury must be sustained, as there was sufficient evidence "to permit a jury to reasonably conclude" that defendant Lugo Díaz was a member and participant of a conspiracy to possess and distribute controlled substances. *See United States v. Rios–Ortiz,* 708 F.3d 310, 316 (1st Cir.2013). "A defendant can be indicted and convicted even if the names of his coconspirators are unknown, as long as the government presents evidence of an agreement between two or more persons." *Id.* **"The essence of a conspiracy is the existence of the conspiracy agreement, not the identity of those who agree."** (Emphasis ours). *Id.* (citing *United States v. Nason,* 9 F.3d

---

4. Jury Instruction No. 7: KINDS OF EVIDENCE: DIRECT AND CIRCUMSTANTIAL

There are two kinds of evidence: direct and circumstantial.

Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did or felt. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can draw the inference, by reason and common sense that

another fact exists, even though it has not been proven directly.

You are entitled to consider both kinds of evidence, direct and circumstantial. The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

155, 159 (1st Cir.1993)). "Therefore, sufficient evidence existed to support the existence of a conspiracy." *Id.* But *see also* the jury instructions related to the definition of conspiracy, which is the underlying factor of the defendant's conviction.[5]

5. Jury Instruction No. 19: CONSPIRACY—DEFINITION

A conspiracy is a combination of two or more persons, acting by concerted action, to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. So, a conspiracy is a kind of "partnership in criminal purpose," in which each member becomes the agent of every other member. The gist of a conspiracy is a combination or agreement to disobey or to disregard the law.

Jury Instruction No. 20: CONSPIRACY—PROOF OF EXISTENCE AND MEMBERSHIP

In determining whether a conspiracy existed, the jury should consider the actions and declarations of all of the alleged participants. A defendant cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed and that the defendant was a member of it, the defendant may be bound by the acts or declarations of conspirators made in furtherance of the conspiracy even if those acts or declarations occurred before the defendant joined the conspiracy.

Mere similarity of conduct among various persons and the fact they may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy. .

However, the evidence in the case need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. What the evidence in the case must show beyond a reasonable doubt, in order to establish proof that the conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

One who willfully joins an existing conspiracy is charged with the same responsibility as if he had been one of the originators of the conspiracy. Additionally, one may be a member of a conspiracy without knowing the identity of, nor the precise number of, all the members, nor the entire scope of the conspiracy.

Jury Instruction No. 21: SUCCESS OF CONSPIRACY IMMATERIAL

It is immaterial that the conspirators may not have succeeded in accomplishing their common object or purpose and in fact may have failed in doing so.

The extent of any defendant's participation, moreover, is not determinative of whether he was part of the conspiracy. A defendant may be considered a conspirator even though he may have played only a minor part in the conspiracy.

The crime of conspiracy is complete upon the agreement to commit the underlying crime.

Jury Instruction No. 22: MUST BE MORE THAN ONE CONSPIRATOR

A person cannot conspire with himself and therefore you cannot find that the defendant was a conspirator unless you find beyond reasonable doubt that he participated in a conspiracy with at least one other person, whether a defendant or not, and whether named in the Indictment or not.

Jury Instruction No. 23: ACTS AND DECLARATIONS OF COCONSPIRATORS

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then statements made and acts done by any person likewise found to be a member may be considered by the jury as evidence in the case as to a defendant found to have been a member, even though the statements and acts may have occurred before the defendant joined the conspiracy or in the absence and without the knowledge of a defendant, provided such statements and acts where knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy. Any admission, incriminatory statement or act, by one person, not designed to further some object or purpose of the conspiracy, may not be considered as evidence against another person who was not present and did not hear the statement made, or see the act done.

In the instant case, one conspiracy was charged and one was proven, as opposed to the existence of multiple conspiracies as alleged by defendant Lugo Díaz. When considering the existence of a single conspiracy, the court will examine whether the following three factors are met: "(1) the existence of a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *See United States v. Rios–Ortiz*, 708 F.3d 310, 318 (1st Cir.2013) (collection of cases cited therein). "The question of whether the evidence adduced at trial demonstrated the existence of one or multiple conspiracies 'is a question of fact for the jury and is reviewed only for sufficiency of evidence.' *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir.2009)." *United States v. Monserrate–Valentín*, 729 F.3d 31, 42 (1st Cir.2013).

"The mere fact that a central person (the 'hub' of a wheel) is involved in multiple conspiracies (the wheel's 'spokes') does not mean that a defendant such as Franco–Santiago who participated in a spoke conspiracy may be convicted of participating in an overarching conspiracy encompassing the entire wheel." *United States v. Franco–Santiago*, 681 F.3d 1, 11 (1st Cir.2012). "There must also be evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy. *Cf. United States v. Huff*, 609 F.3d 1240, 1244 (11th Cir.2010) ("Where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes.") (quoting *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir.2004) (internal quotation marks omitted))."

In the instant case, the "hub" of the wheel is defendant Oppenheimer. However, the mere fact that the hub of the wheel may be involved in multiple conspiracies does not mean that defendant Lugo Díaz who participated in a "spoke" conspiracy may be charged for participating in other conspiracies "encompassing the entire wheel." *Franco–Santiago*, 681 F.3d at 11. Furthermore, the evidence presented showed that defendant Lugo Díaz and Oppenheimer shared a common goal throughout many years, since on or about 2004 to 2012, to possess and distribute several types of narcotic drug controlled substances, such as, cocaine, cocaine base ("crack"), and marijuana, to be distributed in three public housing projects in the area of Carolina, Puerto Rico, to wit, El Coral, Lagos de Blasina and El Faro Public Housing Projects. *See Indictment*, Docket No. 3. Villa Justicia Ward was used for storage and preparation of drugs, as well as drug paraphernalia, weapons and ammunition. *Id.*

"As to interdependence, we have said that '[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key.'" *Franco–Santiago*, 681 F.3d at 11. "[T]he overlap factor is 'satisfied by the pervasive involvement of a single core conspirator, [or] hub character.'" *Id.* citing *United States v. Mangual–Santiago*, 562 F.3d 411, 422 (1st Cir. 2009).

In the instant case, the evidence presented to the jury consistently showed that defendant Oppenheimer was the main leader (or "the hub" of the wheel) of the conspiracy amongst the seven "leaders" included in the *Indictment*, Docket No. 3. Even assuming *arguendo* that defendant Lugo Díaz did not participate in all the drug transactions led by Oppenheimer does not make a single conspiracy into a multiple conspiracy case. In any event, this determination is reserved for the jury

to perform. The Court finds that the three factors of the single conspiracy are met, and adopts the analysis made by the Government in order to avoid being repetitious. *See* Docket No. 2184, pages 411. Notwithstanding, it is important to cite some of the examples included by the Government in its brief showing the three factors of the single conspiracy.

As to the existence of the factor of "a common goal," the Government cited excerpts of the testimony of defendant Zuleyka Cordero Alvarez [13], which are included herein for easy reference. Zuleyka further testified about Oppenheimer's continued leadership in the organization.

1. **Common preparation of drugs by one person to the housing projects—interdependence—Oppenheimer leadership.**

BY MR. CONTRERAS:

Q. Now, I now bring to your attention to the year 2009, running through July 28, 2011. What happened in that period of time? 2009 up to July 28, 2011.

. . .

Q. As it related to the distribution of narcotics.

A. I was decking. I once again was decking.

Q. Was Oppenheimer now out of jail at this point?

A. He came out in 2009.

Q. So you returned to the distribution of narcotics?

A. Yes.

Q. Doing what?

A. Decking.

Q. What type of drugs?

A. Crack and marijuana.

---

6. Hence, this witness/defendant, Zuleyka Cordero Alvarez [13] provides information as to Oppenheimer, the main leader, also that the witness decked for all housing projects,

. . .

Q. And the drugs that you were packaging, where were they being sold?

A. *El Coral housing project, El Faro housing project, and Lagos de Blasina housing project.*

. . .

Q. *Anyone who sold at any of those three public housing projects during that period of time sold for Oppenheimer? All of them sold for Oppenheimer?*

A. *Yes.*

. . .

BY MR. CONTRERAS:

Q. Just one additional question: To your knowledge, was anyone else packaging crack for sale at the three public housing projects during that period of time?

A. With me?

Q. No. Other than you in some location?

A. No.

. . .

*See* Docket No. 2184, pages 4–5. (Emphasis on the original).[6]

2. **Common Goal.**

The testimony of defendant Zeus Cordero Alvarez [25] is also relevant to explain the factor of "a common goal." After having identified the defendant Dean Lugo Díaz in the courtroom, the witness testified that he knew Lugo Díaz as "Bolon." *See* Transcript, Docket No. 2092, page 38.

BY MR. CONTRERAS:

Q. And tell us when you first met Bolon.

and that all sellers sold in all the housing projects under the leadership of defendant Oppenheimer.

A. I have known Bolon since 2006. I met him at El Faro. He would sell me weed when the drug point started over there. You know, we would smoke together and all that at the drug point.

. . .

Q. In 2006, who was the owner of the marijuana sold at El Faro?

A. Nicky.

Q. And who Nicky respond to?

A. Oppenheimer.

. . .

Q. So Bolon was selling Oppenheimer's drugs?

A. Correct.

Q. Do you remember approximately how many times you purchased drugs from Bolon, defendant Bolon?

A. Well, we smoked quite a few times a day, so if it was in the shift at the drug point, I would see him a couple of times.

. . .

Q. How many times have you bought marijuana from the defendant, Bolon?

A. From two to three times in a day, if he was smoking

. . .

Q. Are we talking—what period of time are we talking?

A. 2006 up to the beginning of 2007.

. . .

Q. Would you see him sell marijuana to other individuals while you were present?

A. Of course.

Q. Do you know whether or not Bolon knew that you were also a seller at El Coral?

A. Yes, he knew. Everybody knew.

Q. How did Bolon know you also were a seller?

A. I would tell him that I was selling at El Coral, and everybody knew, all my friends and everybody hanging down there knew that.

. . .

Q. Would you ever talk about drug transactions or selling drugs or give advise to each other?

A. Well, yes. Sometimes I would tell him, you know, to be careful of the agents, that there are some—they are in some cars around, you know, within the conversation between us.

Q. Do you know whether or not Bolon also had a legal job?

A. Yes, he was a barber.

*See* Docket No. 2092, pages 38–42.

As to the factor of interdependence amongst the participants, the Government argued:

15. The evidence at trial further illustrated interdependence among the co-conspirators. Oppenheimer was the leader; he set the rules and supplied the narcotics that would be sold. **His success, however, depended on the continued cooperation of his co-conspirators, including the defendant, who was a seller.** (Emphasis ours).

*See* Docket No. 2184, page 6.

The Government also cited excerpts of defendant Zeus Cordero Alvarez [25] as to "how the profits ultimately reached Oppenheimer," in order to show the factors of interdependence and overlapping in a single conspiracy:

Q. Now, after you sold your drugs, who would you give the money to, the money that pertained to the organization?

A. Well, that you be delivered to each runner, each runner would deliver it to me at the drug point—

BY MR. CONTRERAS:

Q. We will start from the beginning. Once you sold our drugs for that shift, who would you give the money to?

A. All the money I made, I have to give it to a person, a different person, who would give me certain stuff.

Q. That's the runner?

A. That is a runner.

Q. And from there, who would the runner give the money to?

A. The runner has to hand it over to his drug point owner. And then the drug point owner must have some kind of negotiation going with Oppenheimer. If you are asking me about profits, I cannot answer you because that would not be up to me.

Q. So you don't know how much cut each person took?

A. Correct.

*See* Docket No. 2184, pages 6–7. "Accordingly, .the success of the conspiracy depended on each coconspirator fulfilling his/her role." *Id.*

On July 10, 2014, defendant Zeus Cordero Alvarez [25] further testified:

Q. Now, from 2007 forward, did you ever see Bolon selling any other type of drug other than marijuana?

A. Well, after 2006, beginning of 20007, all the drugs go into El Faro, as well. By "all the drugs," I mean crack and cocaine.

Q. Let me stop you for a minute. So prior to that time, only marijuana is sold at El Faro?

A. Yes, correct.

Q. **You are saying about late 2006, early 2007, crack and cocaine started being sold at El Faro?**

A. **Yes, correct.**

Q. **And who is the owner of that crack and cocaine?**

A. **The owners are the same as in El Coral.**

Q. **And who do those owners have to respond to?**

A. **To Oppenheimer.**

*See* Docket No. 2092, page 43. (Emphasis ours).

3. **Oppenheimer leader and overlap of different persons selling different illegal drugs.**

BY MR. CONTRERAS:

Q. In 2007, you indicated that now crack and cocaine are being sold at El Faro?

A. Correct.

Q. Are you still at that point in time going forward buying marijuana from the defendant Bolon?

A. Yes. Marijuana in particular, I went to buy.

Q. **And on those occasions that you would buy from Faraon—correction, from Bolon, would you see him selling other types of drugs to other people?**

A. **Yes, because I have to see it. There's only one pusher per housing project.**

Q. **What does that mean?**

A. **Because we work only one pusher with all the other drugs per housing project.**

Q. **Was there some sort of rule that said each seller had to sell all types of drugs?**

A. **Well, as it is structured, it is an order Oppenheimer issued.**

Q. **Tell us about that order.**

A. **Well, we used to work before, like everybody—each person on his own in different drug point with different seals, and when Oppenheimer was dealing, he would structure the whole thing and organize the thing.**

Q. **And you are saying that one of things he did was require all sellers**

to sell every type of drug during their shift?

A. Correct. Also, to benefit the pusher so he would have more profits.

THE COURT:

Q. When did that start?

THE WITNESS:

Well, since I started selling, that was already on. But when I used to go and buy before I participated, it was— the selling was different.

BY MR. CONTRERAS:

Q. So do you remember, if you remember, how many different occasions you saw Bolon selling crack and cocaine?

A. The times that I would go to buy, once a week, two times a week, whenever he was selling.

Q. You said you would go about once or twice a week?

A. Well, I would go every day, but not every day the same person is doing the pushing.

Q. So is it accurate to say you would see, from the time that crack cocaine entered El Faro, correct me if I am wrong, you would see Bolon selling once or twice a week?

A. Correct.

. . .

Q. My question is, when crack cocaine entered into El Faro, do you remember approximately how many times you saw Bolon selling all types of drugs?

A. Once or twice a week, and I took that to a month, and could be from six to four times.

See Docket No. 2092, pages 46–49. (Emphasis ours).

4. **Overlap in sales of different sales of drugs and at different housing projects.**

BY MR. CONTRERAS:

Q. Do you know a person named Balu?

A. Correct.

Q. How do you know Balu?

A. Balu was a pusher with me at El Coral.

Q. Do you know whether or not the defendant knows Balu, whether Bolon knows Balu?

A. Yes, he does.

Q. How do you know that?

A. Because we used to hang out all together?

Q. Doing what?

A. Smoking at El Faro housing project.

. . .

THE COURT:

And Balu is associated with El Coral?

THE WITNESS:

Correct. He was a pusher along with me. Sometimes I would tally up the shift with him to work.

. . .

BY MR. CONTRERAS:

Q. Did Balu also sell drugs for Oppenheimer?

A. Correct.

Q. You indicated you were arrested on February 19, 2008. Did you completely stop selling drugs after that date?

A. Not fully.

Q. Explain what happened.

A. After that I went over to Lagos de Blasina to sell.

Q. To sell what?

A. Crack, marijuana, and heroin.

Q. Now you mentioned something earlier about El Faro. Was heroin sold at El Faro?

A. No.

. . .

Q. And if you know, who made the decision not to sell heroin at El Faro?

**A. Oppenheimer did.**

*See* Docket No. 2092, pages 49–51. (Emphasis ours).

In sum, defendant Zuleyka Cordero Vega [13] provided packaging services of crack and marijuana to defendant Oppenheimer to be distributed in all three housing projects, that is, El Faro, El Coral and Lagos de Blasina. Defendant Lugo Díaz [54] was a seller of marijuana, crack and cocaine at El Faro under the "hub" of Oppenheimer. Likewise, defendant Zeus Cordero Alvarez [25] was the pusher at El Coral selling crack and cocaine, and in Lagos de Blasina selling crack, marijuana and heroin, all under the leadership of defendant Oppenheimer. Defendant Carlos A. Romero Ortiz [22] was the seller of crack and cocaine at El Coral, also under the leadership of defendant Oppenheimer.

In *United States v. Rivera–Donate,* 682 F.3d 120, 134 (1st Cir.2012), the Court entertained the often recurring issue in Puerto Rico of a conspiracy to possess with intent to distribute multi-kilograms of controlled substances.

> We have also found that evidence of even a single drug transaction, under circumstances that reflect the defendant's tacit agreement relating to the continuing drug-trafficking enterprise, can be sufficient to sustain a conviction for conspiracy to distribute narcotics. *See United States v. Rivera–Ruiz,* 244 F.3d 263, 269 (1st Cir.2001) (agreeing with this proposition and citing cases).... *See United States v. Paret–Ruiz,* 567 F.3d 1, 6 (1st Cir.2009) ("**An agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit**"); *United States v. Concemi,* 957 F.2d 942, 950 (1st Cir.1992) ("**[A]n agreement ... may be inferred from a development and collocation of circumstances.**") (quoting *United States v. Smith,* 680 F.2d 255,

259 (1st Cir.1982) (internal quotation marks omitted)). (Emphasis ours).

*See also United States v. Liriano,* 761 F.3d at 134–35. "An agreement to join a conspiracy 'may be express or tacit ... and may be proved by direct or circumstantial evidence.' *United States v. Rivera Calderón,* 578 F.3d 78, 88 (1st Cir.2009)."

In *Trinidad–Acosta,* 773 F.3d at 311, citing *Symonevich,* 688 F.3d 12, 24 (1st Cir.2012), the Court held:

> "**[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it.**" *Id.* **We have held that "the continuing purchase and sale relationship between [the dealers and the defendant], and the dealers' knowledge of the [defendant's] re-distribution, would permit a jury to infer both an agreement between them that [the defendant] possess the drugs and the requisite intent as to the distribution.**" (Emphasis ours). *United States v. Symonevich,* 688 F.3d 12, 24 (1st Cir.2012) (alterations in original) (citation omitted).

▇ In the instant case, defendant Lugo Díaz alleges that the evidence admitted is insufficient to prove the conspiracy as charged, that is, there was only one conspiracy as opposed to multiple conspiracies, nor was the Government successful in connecting the participation and relationship the defendant Lugo Díaz with the conspiracy as charged. However, defendant Lugo Díaz alleges that the Government failed to connect defendant with the conspiracy charged. The Court defers. The Court finds that defendant Lugo Díaz is incorrect on this assertion pursuant to the facts narrated above. Further, the law dictates otherwise, as "each coconspirator need not know of or have contact with all other members, nor must they know all

of the details of the conspiracy or participate in every act in furtherance of it." *Trinidad–Acosta,* 773 F.3d at 311. "[T]he continuing purchase and sale relationship between [the dealers and the defendant], and the dealers' knowledge of the [defendant's] re-distribution, would permit a jury to infer both an agreement between them that [the defendant] possess the drugs and the requisite intent as to the distribution." *Id.*

Hence, the Court sustains the jury verdict and denies defendant's motion for acquittal.

### A Final Note

Finally, "if the verdict is 'supported by a plausible rendition of the record,' [the Court] must uphold" the verdict. *See United States v. Bobadilla–Pagán,* 747 F.3d 26, 32 (1st Cir.2014), citing *United States v. Cortés–Cabán,* 691 F.3d 1, 16 (1st Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 2765, 186 L.Ed.2d 220 (2013), (quoting *United States v. Hernández,* 218 F.3d 58, 64 (1st Cir.2000)).

In the instant case, the defendant Lugo Díaz was seen on video tapes or there was testimony of him performing drug transactions at El Faro, a public housing project in the area of Carolina, Puerto Rico. *See* Government's Exhibits No. 15, 21, 22. Moreover, the cooperating witnesses Zuleyka Cordero Vega [13] and Zeus Cordero Alvarez [25] placed defendant Lugo Díaz selling drugs, such as, cocaine, cocaine base ("crack"), marijuana at El Faro public housing project. *See* Docket entries No. 2092, 2184. However, the defendant Lugo Díaz does not have to sell drugs in all of the public housing projects covered by the conspiracy. *Trinidad–Acosta,* 773 F.3d at 310–11.

Based upon the evidence presented the jury found the defendant Lugo Díaz responsible of selling the types of narcotic drug controlled substances charged in the *Indictment,* Docket No. 3. Based on foreseeability by knowing others who did or told him, or based on direct evidence in participating himself in same but not necessarily in all the public housing projects.

### Conclusion

In view of the foregoing, the Court finds that the defendant Dean Lugo Díaz [54] has been unable to show that there is insufficient evidence on the record to warrant the acquittal requested. The Court stresses that the evidence presented at trial was not only sufficient but relevant to show that the defendant Lugo Díaz was connected to the charged conspiracy and was indeed part of said conspiracy. *See United States v. Rodríguez–Soler,* 773 F.3d 289 (1st Cir.2014). Hence, the defendant's motion for acquittal, Docket No. 2147, is denied.

IT IS SO ORDERED.